# CITICORP SAVINGS OF FLORIDA, etc. v BRACE, et al.

Case No. 84-0047-CA-01-HDH

Twentieth Judicial Circuit, Collier County

March 21, 1986

## APPEARANCES OF COUNSEL

**Frederick C. Kramer** for defendant.

**Andrew P. Laszlos** for plaintiff.

## OPINION OF THE COURT

HUGH D. HAYES, Circuit Judge.

THIS CAUSE came on for hearing upon the Plaintiff's Motion for

Deficiency Judgment, and the Court, after having heard argument of counsel, testimony and evidence presented, the Motion is DENIED.

## FINDING OF FACTS

1. The original Plaintiff in this suit was BISCAYNE FEDERAL SAVINGS AND LOAN, a federal association. Effective the 26th day of March, 1984, BISCAYNE changed its name to CITICORP SAVINGS OF FLORIDA, a federal savings and loan association.

2. On or about the 16th day of March, 1983, the Defenant, PAUL K. BRACE, executed and delivered to the Plaintiff a Promissory Note and Mortgage securing the property subject to this suit and the Mortgage was recorded on the 19th day of April, 1983 in the Public Records of Collier County, Florida.

3. On or about the 18th day of April, 1983, the Defendant, CAROL BURNETT, INC., acquired title to the subject property by Warranty Deed, which deed was recorded on the 26th day of August, 1983 in the Public Records of Collier County, Florida.

4. A default occurred, and the Plaintiff obtained a Final Judgment of Foreclosure against the Defendants on the 28th day of December, 1984.

5. The Defendant, PAUL K. BRACE, essentially admitted most of the liability under the foreclosure action, however, he filed several affirmative defenses in denial of any liability should the Plaintiff seek a Deficiency Judgment.

6. On or about the 11th day of February, 1985, the Plaintiff received a title to the subject property based upon its bid of One Hundred ($100.00) Dollars at the foreclosure sale. The Court, at the deficiency hearing, did agree with counsel for the Plaintiff that competent evidence substantiated that the fair market value of the subject condominium property, as of the date of the foreclosure sale, was One Hundred Twenty Thousand ($120,000.00) Dollars.

## RE: DEFICIENCY JUDGMENT/EQUITY COURT

7. The amount of deficiency being sought by the Plaintiff against the Defendant, PAUL K. BRACE, is Forty-Eight Thousand Four Hundred Twenty Dollars and Thirty-Nine Cents ($48,420.39), representing the difference between the total amount due to the Plaintiff under the Final Judgment minus the One Hundred Twenty Thousand ($120,000.00) Dollar fair market value of the property.

8. At trial, upon direct examination by Defendant's counsel, the Defendant, PAUL K. BRACE, admitted that he was employed as a

certified public accountant in the firm of Poccia and Brace, located in Amawalk, New York. The testimony reflected that Ms. Joann Poccia was not only a partner in the CPA firm, but likewise, was the wife of PAUL K. BRACE. Mr. Brace additionally stated that at no point in time did he have any connection with CAROL BURNETT, INC., as an officer, director, agent, employee or representative.

9. Upon cross-examination by counsel for the Plaintiff the following discussion occurred:

Q Did you know when you first entered this deal that the property was going to be acquired by Carol Burnett, Inc.?

A Yes.

Q What motivated you to make this deal? What motivated you to execute the note and mortgage? What did you receive?

A I received payment from Carol Burnett, Inc.

Q In the sum of?

A I'm not sure.

Q You have no recollection as to the amount you received? A hundred dollars?

A No, I can't speculate. It may have been three or four thousand.

Q What was that three or four thousand dollars for? What service did you perform?

A For executing a lot of papers, for undertaking the liability initially.

Q Did you receive anything aside from that monetary remuneration?

A No.

Q Nothing, just three or four thousand dollars and you knew at that time that you received the money and executed the note and mortgage that you would be incurring a substantial liability as stated expressly in the note and mortgage? You didn't know that?

A No.

Q Did you read the note and mortgage?

A I read the note and mortgage and I understood that everything that the bank would require which would cause the sale, to approve the sale and the assumption and all of that had also taken place.

Q So that you wouldn't even be at risk?

A Yes.

(Transcript of Proceedings of Paul K. Brace, Page 14, Lines 11 through 25 and Page 15, Lines 1-18, taken 9 October 1985)

10. When Ms. Joann Poccia, the wife of Co-Defendant, PAUL K. BRACE, was called to testify, her direct examination testimony reflected the following discussion:

Q Was there a problem with these corporations acquiring large blocks of properties and financing with Biscayne Federal Savings and Loan Association?

A Yes, they could not go and get a direct loan on these units. They had to use individuals.

(Transcript of Proceeding of Joann Poccia, Page 12, Lines 16 through 20, taken 9 October 1985)

Q So they were using individuals to qualify?

A Yes, in fact I had been told by the bank, you know, in Paragraph 17 was the way that the bank went around whatever the other requirement was for their corporation to obtain financing and that they were assumable. In fact, we had a letter from Barbara Genovese stating that they were, all the loans and mortgages were assumable if certain conditions were met. And at that time the assumption fee was $100 and that the new purchaser was qualified by submitting the balance sheet and a PL & A, and there was a transfer form and that would release the individual.

(Transcript of Proceeding of Joann Poccia, Page 13, Lines 2 through 12, taken 9 October 1985)

11. On cross-examination by counsel for the Plaintiff, the testimony reflected:

MR. LASZLO: In this present situation, including unit 203 at the Sea Winds in April 1983 had you ever spoken to Barbara Genovese concerning this procedure?

THE WITNESS: She had forwarded the papers up to be signed which they were signed but they were held. The notes were dated the 16th of whatever, of March but they were sent to Carol Burnett, Inc., and told to be held until they were approved for transfer because we did not want the closing to go through until the corporation had been approved for the transfer. And that's why they were held until the 18th. The proceeds checks that went to the attorney were dated also the 18th of April, Guy DeLoach.

80

(Transcript of Proceeding of Joann Poccia, Page 14, Lines 15 through 25 and Page 15, Lines 1-2, taken 9 October 1985)

MR. LASZLO: To your understanding was this arrangement made between the bank and these corporate entities prior to people such as Mr. Brace getting involved?

THE WITNESS: Yes, there had been an open discussion and they knew what the scenario was to be. Barbara Genovese was most anxious to generate as many loans as possible, she had come to see me about it.

(Transcript of Proceeding of Joann Poccia, Page 15, Lines 12 through 19, taken 9 October 1985)

Q If you could then to your personal knowledge at the closings of these individual loans, did Biscayne Federal Savings and Loan Association realize any substantial cash flow?

A Origination fees.

Q Points; is that correct?

A Points.

(Transcript of Proceeding of Joann Poccia, Page 16, Lines 13 through 19, taken 9 October 1985)

Q Did he enter into this deal based on representations you made to him regarding the potential—

A He had been in two others.

Q He had been involved in two other deals similar to this?

A Yes.

Q What was your relation to the specific deal that Paul Brace was involved with, you were involved with the closing statements?

A Handling the papers, the processing of them.

(Transcript of Proceeding of Joann Poccia, Page 21, Lines 7 through 16, taken 9 October 1985)

A What I understood and what I conveyed to Mr. Brace was that there would be a transfer, an immediate transfer and his liability would no longer exist.

(Transcript of Proceeding of Joann Poccia, Page 25, Lines 10 through 12, taken 9 October 1985)

RE: MORTGAGE TRANSFER PER "PARAGRAPH 17"

12. Even if the Court could not conclude that a basis for denial of

81

Plaintiff's claim existed on purely equitable principles, the Court does specifically find a sound factual and legal basis for the Defendant's argument to the effect that a mortgage (and liability) transfer was processed and accepted by the Plaintiff pursuant to paragraph 17 of the Mortgage Agreement, as well as Plaintiff's Exhibits 7 and 9 which were admitted into evidence at trial.

Paragraph 17 of the Mortgage Agreement states as follows:

Transfer of the Property; Assumption. If all or any part of the Property or an interest therein is sold or transferred by borrower without Lender's prior written consent, (excluding (a) the creation of a lien or encumbrance subordinate to this Mortgage, (b) the creation of a purchase money security interest for household appliances (c) a transfer by devise, descent or by operation of law upon the death of a joint tenant or (d) the grant of any leasehold interest of three years or less not containing an option to purchase), Lender may, at Lender's option, declare all the sums secured by this Mortgage to be immediately due and payable. Lender shall have waived such option to accelerate if, prior to the sale or transfer, Lender and the person to whom the Property is to be sold or transferred reach agreement in writing that the credit of such person is satisfactory to Lender and that the interest payable on the sums secured by this Mortgage shall be at such rate as Lender shall request. If Lender has waived the option to accelerate provided in this paragraph 17 and if Borrower's successor in interest has executed a written assumption agreement accepted in writing by Lender, Lender shall release Borrower from all obligations under this Mortgage and the Note.

If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration in accordance with paragraph 14 hereof. Such notice shall provide a period of not less than 30 days from the date the notice is mailed within which Borrower may pay sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by paragraph 18 hereof.

13. The evidence which was presented at trial, both in documentary form as well as live testimony, clearly demonstrated that the Plaintiff waived its option to accelerate, and the evidence likewise supported an assumption, in writing, by Co-Defendant, BURNETT, as well as an acceptance of the transfer by the Plaintiff, all of which legally resulted in the release of the original borrower, Defendant BRACE, from all obligations under the Mortgage and Note.

82

## CONCLUSIONS OF LAW

Historically, the Florida courts have consistently ruled that the rendering of a deficiency decree is generally the rule rather than the exception, unless there are facts and circumstances creating equitable considerations upon which a court should deny the deficiency decree and the exercise of its discretion. *Exchange National Bank of Tampa v. Clark-Ray-Johnson Company*, 116 So. 648 (Fla. 1928). An exercise of good judicial discretion with regard to the granting of a deficiency decree and consonant with equity in light of the facts should not be disturbed on appeal unless there is a showing of a clear abuse of good judicial discretion. *S/D Enterprises, Inc. v. The Chase Manhattan Bank*, 374 So.2d 1121 (Fla. 3d DCA 1979).

It is likewise generally accepted that in the absence of justification or reason for the chancellor's denial of a deficiency decree in the record on appeal, the chancellor should be required to reconsider the matter upon appropriate proceedings and more specifically delineate the grounds upon which the deficiency is being denied. *Colmes v. Hoco, Inc. of Dade County*, 152 So.2d 524 (Fla. 3d DCA 1963). This chancellor/trial court has quite meticulously delineated in its findings of fact the very issues which demonstrate that the equity of this court cannot be elicited by the Plaintiff in this case, who stands in the shoes of its predecessor in interest, because the parties clearly do not come into court with anything but the most soiled of hands. The trial record, as clearly and succinctly described from the foregoing quotations of testimony, sufficiently support the trial court's discretionary refusal to grant the deficiency judgment and, in fact, it is the belief of the chancellor/trial court that this denial of a deficiency judgment, sought after the foreclosure proceedings were completed, should, again, based upon the facts of this particular case, preclude and prohibit the maintenance by the Plaintiff in the present action of any "at law" action on the note to recover from the same debt. *White v. Kaplan*, 449 So.2d 954 (Fla. 3d DCA 1984).

This Court does not feel that it should take the position or appear to be "punishing" the Plaintiff in this case, especially, since it is a successor in interest to New Biscayne Federal Savings and Loan Association of Miami; however, it legally stands in the same shoes as the successor, and it is beyond argument that the judicial courts of the State of Florida should not in any way condone nor support through the granting of a deficiency decree such disreputable and dangerous business practices which clearly were found in this case, and which clearly violate the standards of sound business practice. The Court

83

should leave the parties where it found them: the ends of justice and equity will surely thus be best served.

DONE AND ORDERED in Naples, Collier County, Florida this 21st day of March, 1986.